## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **KIMBERLY GLANVILLE** ) <br> **3814 West Overlea Ave.** ) <br> **Baltimore, MD 21206** ) <br> ) <br> *Plaintiff,* ) <br> ) <br> **v.** ) <br> ) <br> ) <br> **BALTIMORE POLICE DEPARTMENT** ) <br> **242 W 29th St.** ) <br> **Baltimore, MD 21211** ) <br> ) <br> **and** ) <br> ) <br> **MAYOR AND CITY COUNCIL OF** ) <br> **BALTIMORE** ) <br> ) <br> *Defendants.* ) <br> ) <br> **Serve:** ) <br> ) <br> **The Baltimore City Law Department** ) <br> **Office of Legal Affairs** ) <br> **C/O City Hall, Room 250** ) <br> **100 N. Holliday St.** ) <br> **Baltimore, MD 21202** ) <br> ) <br> **Baltimore Police Department Headquarters** ) <br> **601 E. Fayette St.** ) <br> **Baltimore, MD 21202** ) | **Case No.:** <br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Kimberly Glanville, Plaintiff, (hereinafter "Plaintiff") by and through undersigned counsel, to respectfully submit this complaint against Defendants, Baltimore Police Department, (hereinafter "Defendant" or "BPD") and in support thereof states as follows:

## INTRODUCTION

1.  On August 10, 2016, the Department of Justice published a scathing report about the Baltimore Police Department's widespread constitutional violations, the targeting of African Americans, and a culture of retaliation. And, while the investigation and report focused largely on how Baltimore police abused the law, the people they were meant to serve, and the public trust, the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black officers and sergeants remains pervasive, continuous, and swept under the rug. The Plaintiff's allegations stated herein show that corruption and misconduct not only continue throughout the BPD but are perpetrated by its policymakers and leaders. *This case is about when the police are fearful of the police—their own brothers and sisters in blue.*

2.  The City of Baltimore entered into a consent decree on April 7, 2017, after the Department of Justice published findings (Aug. 10, 2016) that the Baltimore Police Department had engaged in a pattern and practice of conduct that violated the First, Fourth, and Fourteenth Amendment to the United States Constitution, and other statutory provision of state and federal law.

3.  The Consent decree was agreed to by then Mayor Catherine, E. Pugh and then, Police Commissioner Kevin Davis who promised to ensure that the BPD would protect individuals' statutory and constitutional rights, treat individuals with dignity and respect, impose discipline for misconduct fairly and efficiently, and enhance support for officers through robust supervision.

4. Since entering into the consent decree, the City of Baltimore has paid more than $24,169,772[1] in settlements as a result of lawsuits alleging police misconduct against BPD officers.

5. Despite the promises contained in the consent decree, and after paying more than twenty-four million dollars in misconduct settlements since making those promises, the BPD remains plagued by corruption and misconduct.

6. This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"); the Civil Rights Act of 1866, Section 1983(a) ("Section 1983"); the Civil Rights Act of 1866, Section 1981 ("Section 1981"), the Maryland Fair Employment Practices Act, Md. Code § 20-601 *et seq.* ("MFEPA") for the Defendants' unlawful harassment, discrimination, and hostile work environment based on race (African American), color (Black), sex (female) and retaliation against the Plaintiff.

## JURISDICTION AND VENUE

7. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.*, Section 1983, Section 1981, and the Maryland Fair Employment Practices Act ("MFEPA") to redress and enjoin unlawful employment practices of the Defendants.

8. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

---

[1] Per semi-annual reporting by the Baltimore City Law Department titled, *Reports of Civil Actions involving Alleged Police Misconduct* published on the world wide web at https://law.baltimorecity.gov/transparency

9. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendants, which operates in Baltimore, Maryland.

10. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transacts substantial business in this District, and Defendants maintains employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

11. Plaintiff has exhausted all of her administrative remedies.

12. Plaintiff initiated her administrative process with the Baltimore Field Office of the Equal Employment Opportunity Commission ("EEOC") on or about January 26, 2022 under First Charge No. 531-2022-01076, alleging retaliation and discrimination based on race, color, and sex. This was a continuing action from events from May 18, 2018 to March 5, 2019. The EEOC issued a Determination and Notice of Right to Sue on May 5, 2022 and the Plaintiff declined to file suit within the prescribed deadline.

13. On or about February 13, 2023 Plaintiff filed her second charge of discrimination with the EEOC under Second Charge No. 531-2023-01635. On or about February 23, 2023, Plaintiff amended her charge of discrimination complaint, alleging discrimination on the basis of race, color, and sex, hostile work environment, and retaliation. The events described in the Second Charge range from April 29, 2022 to February 21, 2023.

14. On April 5, 2023, the Baltimore Field Office issued a notice that per the EEOC's work-sharing agreement, the Charge was being transferred to the Baltimore Community Relations Commission ("BCRC") for further processing.

15. Upon Plaintiff's request, on September 21, 2023, the EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on September 22, 2023.

16. On December 14, 2023 Plaintiff timely filed suit in this U.S. District Court in the District Court for Maryland under her Second Charge in accordance with the Notice of Rights for Second Charge No. 531-2023-01635, which provided Plaintiff the right to file a Complaint within 90 days of receipt of the Notice.

17. On December 31, 2024 Plaintiff's Civil Action No. EA-23-3395 for her Second Charge was dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

18. On May 19, 2025 Plaintiff filed her third charge of discrimination with the EEOC under Third Charge No. 531-2025-02973 on the basis of race, color, and sex, hostile work environment, and retaliation. Plaintiff marked this as a continuing action and the most recent discriminatory event was her unlawful termination on September 10, 2024.

19. On June 12, 2025, Plaintiff requested the issuance of a Notice of Right to Sue for her Third Charge because she wished to pursue her claims in court and requested the prompt issuance of the Notice of Right to Sue pursuant to 29 C.F.R. 1601.28(a)(1).

20. On June 17, 2025 the Baltimore Filed Office dismissed her Third Charge and issued a Notice of Right to Sue because it was unlikely the EEOC would be able to complete its investigation within 180-days from the date the charge was filed.

21. Accordingly, Plaintiff filed this suit within the timeline prescribed in Notice of Right To Sue. Ninety (90) days from June 17, 2025 is September 15, 2025. Plaintiff timely filed this suit based on her Third Charge on or before September 15, 2025.

## NATURE OF THE ACTION

22. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendants' violation of those statutes.

23. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, loss of wages due to unlawful and unjustified termination, loss of career advantage, emotional tranquility, and denial of her constitutional and statutory rights.

24. This action seeks declaratory and injunctive relief, as well as compensatory and punitive damages to secure future protection, to redress the past deprivation of rights guaranteed to the Plaintiff, and to deter Defendants from future discriminatory acts.

## PARTIES

25. Plaintiff, Sgt. Kimberly Glanville, is an African American (black) female who resides in Baltimore City.

26. The Baltimore Police Department ("Defendant" or "BPD") is the 8th largest municipal police force in the United States, staffed by nearly 3,100 civilian and sworn personnel. The Department's jurisdiction covers Maryland's largest city, with a population of approximately 611,648 people.

27. Defendant Mayor and City of Baltimore ("the City") is a municipality located within the District of Maryland. The City of Baltimore is a local government within the meaning of 42 U.S.C. § 14141. The City is responsible for funding BPD and for the acts or omissions of BPD.

28. Plaintiff worked at the Baltimore Police Department ("BPD") during the relevant period.

6

29. During the relevant period, Defendants employed Plaintiff, Sgt. Glanville.

30. During the relevant period, Plaintiff was Defendants' employee within the meaning and entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

31. Plaintiff, Sgt. Glanville, is a Police Sergeant with the Baltimore Police Department (BPD) and has served as an Officer for approximately 28 years.

32. For several years prior to her complaint filings, Plaintiff experienced discriminatory treatment and hostile work environment wherein BPD leadership made racially derogatory comments regarding her body and appearance and subjected the Plaintiff to baseless poor performance evaluations and unsubstantiated disciplinary actions based upon false and fabricated allegations by BPD management and supervisory officials without having proper evidence to sustain any disciplinary action. Plaintiff began to engage in protected activity by filing grievances against individuals such as her supervisor Lieutenant Monique Lucien for physically assaulting the Plaintiff in the workplace, and later made formal complaints of discrimination, hostile work environment, and retaliation to BPD's EEO office and the federal EEOC due to the ongoing and expanding actions taken against her by BPD officials.

33. On or about May 18, 2018, Plaintiff was the sector supervisor working in the Southwest District when now-retired Maj. Donald Diehl (White, male) came into her office and began to yell at her, shouting "what is your problem" or words to that effect. When Plaintiff asked what he was referring to, then-Captain Diehl told her she needed to fix her problem and ordered Plaintiff upstairs to his office. At this point, Plaintiff solicited the assistance of Lt. Ebony Lee (Black, female) (now retired) and asked her to go to the office with her because

she was constantly under attack by White male supervisors because of her race, color, and sex and did not believe that Capt. Diehl had her best interests in mind. Once in the office, Capt. Diehl made the same comment about Plaintiff having a problem, and when Plaintiff asked again what he was referring to, Capt. Diehl stated that all of the other White male supervisors came to him and told him that they had a problem with Plaintiff and did not like or support her. Plaintiff believed she was the target of such hate, ridicule, and scrutiny because of her race (African American), color (black), and sex (female). No other African American, black, female officer in the Southwest District was treated with such egregious discriminatory treatment because of their race, color, and sex. Lt. Ebony Lee was both a witness to such harsh conduct towards Plaintiff but not subjected to similar discriminatory action towards Plaintiff.

34. Plaintiff asked what measures would be taken to ensure her safety in the face of such hostility, but Capt. Diehl made no reassurances and would eventually do nothing to aid Plaintiff. Plaintiff eventually filed an internal complaint against Capt. Diehl because she was afraid of retaliation by BPD management and supervisory officials, but BPD failed to follow up with the Plaintiff about her complaint.

35. On or about November 7, 2018, Sgt. Ethan Newberg (White, male), was responsible for relieving Plaintiff as the Baker shift supervisor. However, Plaintiff was at a hazmat active scene as the incident commander. When Sgt. Newberg arrived at the scene, unbeknownst to Plaintiff he proceeded to act belligerent and disrespectful towards Plaintiff. Plaintiff informed Sgt. Newberg that he was putting citizens in harm's way and his public humiliation of the Plaintiff was unwelcomed, but he disregarded Plaintiff's advice and

instead proceeded to degrade her in front of the public and media representatives because of her race (African American), color (black), and sex (female).

36. Sgt. Newberg intentionally failed to record the incidents on his body-worn camera and continually kept turning his camera on and off when he was talking racially derogatory to Plaintiff or violating policies so that it would not be on tape. Eventually, Sgt. Newberg walked off the scene and got in his car to leave without relieving Plaintiff of her duty. Before he abandoned his post, Sgt. Newberg yelled in rage at Plaintiff that "if she [Plaintiff] didn't like the way he was talking to her then she could "Blue Team" him and that he did not care what she did".

37. Shortly after the incident, Lt. Mistysyn called Plaintiff into the shift commander's office and proceeded to intimidate her by demanding to know why she reported Sgt. Newberg by sending paperwork to Health and Wellness advising them that Sgt. Newberg may have had a breakdown and needed assistance. Plaintiff informed Lt. Mistysyn that she had advised Lt. Stanley (White, male) of Sgt. Newberg's actions and that Lt. Stanley told her that Sgt. Newberg did not have to tell her where he was going. Plaintiff believed she was targeted by BPD management and supervisory officials because of her race, color, and sex; and BPD failed to reprimand or discipline Sgt. Newberg for abandoning his post because he is a White male officer.

38. Throughout 2018 and 2019, Lt. Mistysyn would fabricate misconduct claims to intentionally put Plaintiff into the Blue Team system with several occurrences as a way to stifle her growth and career opportunities. Under BPD written policy, if Plaintiff accumulated too many open numbers in the Blue Team system, she would not be eligible for promotions or privileged to move into a specialized criminal investigation unit. Further,

9

Lt. Mistysyn falsely gave Plaintiff a low performance rating and never commended her actions for having coordinated successful response effort at the hazmat scene.

39. Lt. Mistysyn and now-Captain Kiera Saunders (White, female) conspired to charge Plaintiff with being AWOL (Absent Without Leave) despite Plaintiff actually being on approved leave. Lt. Mistysyn failed to do his due diligence, failed to investigate the false allegation of Plaintiff being AWOL, and recklessly used false allegations as an opportunity to report unsubstantiated misconduct against Plaintiff because of her race, color, and sex. These conspired disciplinary actions and baseless misconduct resulted in yet another open number on the Blue Team system and adversely affected the Plaintiff's promotional opportunities and opportunity to advance her career with training in the Criminal Investigation Division.

40. Even after Plaintiff transferred to the Northern District, the discrimination and retaliation followed because BPD management and supervisory officials discriminatorily labeled Plaintiff as "Enemy Number One". As an enemy of the BPD, officials were encouraged to surveil Plaintiff because of her race, color, and sex and incentivized with promotions for reporting any suspected misconduct. On or about February 8, 2019, Plaintiff was 5C10 for Sector 1 of her district along with then-Sgt. McGriff (Black, male) (5C09) and then-Sgt. Shiflett (White, male) (5C30). A call came in for a homicide in then-Sgt. Shiflett's sector. BPD Policy dictates that a supervisor needs to respond, but then-Sgt. Shiflett refused to respond and stated that he would not report to the active homicide scene as required by his duty responsibilities. As such, Plaintiff volunteered to go but was later ordered to respond into the station from the scene and Captain Heiss (White, male) ordered her into his office.[2]

---

[2] Upon information and belief, Captain Heiss, Lt. Mistysyn, and Sgt. Newberg have since left the Department due to their own sustained EEO charges and criminal misconduct.

41. Capt. Heiss proceeded to berate Plaintiff because of her race, color, and sex for the failure of a supervisor not responding sooner to the homicide scene. Plaintiff informed Capt. Heiss that it was not her sector, and it was only after Sgt. Shiflett refused to respond to the scene that Plaintiff volunteered to report to the active homicide scene. Capt. Heiss told Plaintiff, "shut up because this meeting was not setup for the Plaintiff to speak", and Plaintiff was told to stand in silence and that she was not allowed to defend herself, but Sgt. Shiflett was never questioned about the incident because he is a White male. Plaintiff and Sgt. Shiflett are similarly situated employees for BPD, who shared supervisory duties, and first- and second-line reports. However, Plaintiff was threatened with a misconduct charge, berated in front of her peers, and privately reprimanded because of her race (African American), color (black), and sex (female); while Sgt. Shiflett (White, male) was never reprimanded for refusing to perform his required supervisory operational duties in his assigned sector. Plaintiff believes she was targeted, held responsible for her supervisors' misconduct, and discriminated against because of her race, color, and sex; and Sgt. Shiflett was not reprimanded because BPD has a pattern and practice of protecting White male officers when they violate written BPD policies.

42. On another occasion, Plaintiff served as back up to Sgt. Shiflett during an arrest of a juvenile Black male. While on the scene, Sgt. Shiflett publicly demanded Plaintiff to walk up the street away from the arrest scene because he didn't want her to witness his assault and use of excessive force against the handcuffed young Black male. Sgt. Shiflett wanted to assault the juvenile by using excessive force, so he requested the Plaintiff remove herself from the scene so she could write the Use of Excessive Force report. At the time, BPD Policy stated that a party or witness to use of excessive force cannot be the author of the

use of excessive force report. So, Sgt. Shiflett demanded the Plaintiff leave the scene so she would not witness the use of excessive force Sgt. Shiflett planned to deploy on the juvenile black male. However, Plaintiff refused and told Sgt. Shiflett that the juvenile's parents needed to be called per BPD policy and local laws. After the juvenile was transported, Sgt. Shiflett cursed at Plaintiff with derogatory racial remarks and told Plaintiff that he would request a meeting with Capt. Heiss to report her actions. Plaintiff believed Sgt. Shiflett was discriminating and retaliating against Plaintiff because of her race, color, and sex; and her prior protected activity (reporting Sgt. Shiflett to Captain Heiss for discrimination and failure to perform his supervisory duties). Since this incident Sgt. Shiflett has been promoted two or three ranks to Captain or Major; while the Plaintiff has been denied career advancement and refused promotions to the rank of Lieutenant.

43. Plaintiff was falsely charged with misconduct and placed into the Blue Team system again by Lt. Cormegna (White, male) after he made false allegations about Plaintiff after she requested to meet with him about one of his officers not responding to a call for a shooting. Plaintiff requested a meeting with Lt. Cormegna and the Officer in question. As a result of the multiple false complaints Lt. Mistysyn and Lt. Cormegna made against Plaintiff and because of her race, color, and sex, Plaintiff was denied the opportunity to become the administrative Sergeant for Major Latonya Bishop. Plaintiff only learned of these false misconduct charges and multiple numbers in the Blue Team system when she was denied the Administrative Sergeant opportunity by Lt. Colonel Sharee Briscoe. Plaintiff believed she was denied this promotion as retaliation for her prior protected activity (prior EEOC charge and reporting discriminatory treatment by Captain Heiss, Sgt. Newberg, and Sgt. Shiflett).

44. In January 2022, Plaintiff filed another EEOC charge regarding the above-mentioned incidents.

45. In continuation of the retaliation and discrimination complained of in Plaintiff's prior EEOC charge and in further retaliation for her protected activity after filing her Charge, Plaintiff has been the target of Defendants' retaliatory conduct, concerted threats, and adverse employment actions by being falsely accused of misconduct in an attempt to injure her promotion eligibility and demote her career advancement.

46. On Wednesday April 20, 2022, at approximately 2150 hours, the Sector Three Unit was sitting at 3700 W. Belvedere Ave. along with Plaintiff, who was on the opposite side of the street and answering up as NWD 1 the entire shift. Plaintiff's deployment area was Belvedere Ave/5400 Cordelia Ave, which is not a 10-7 deployment. At approximately 2150 hours, Officer Tiburzi advised over the air that he was clearing for the day and wanted a unit to pay special attention area. Plaintiff immediately advised him that she was in the deployment area.

47. Lieutenant Yurkovich began calling for Northwest District 14, demonstrating that by the end of the night he didn't know who he had working for him. Lieutenant Yurkovich then demanded that NWD 14 answer the radio. There was no NWD 14 unit, and the dispatcher advised him of this. Lt. Yurkovich advised that he was looking for the unit in the 3700 block of W. Belvedere Ave. It was at this time that Plaintiff realized that he was trying to raise her, and she immediately answered. Lieutenant Yurkovich then proceeded to inform her that he wanted Plaintiff to advise him when she was securing her location so he could send the post officer to her location. He gave clear instructions, and Plaintiff followed them.

13

48. On April 29, 2022, Plaintiff was working an overtime shift in her designated area, NWD 8: Garrison Blvd. Corridor. On weekends she often would help out by also covering 5700 Wabash Ave, to give an assessment of how many vehicles had gathered for a car show that occurred every weekend. This was an extra duty that Plaintiff volunteered for in order to assist the District with coverage shortages and to help combat issues with the car show.

49. During her overtime shift, a double homicide occurred at 3700 Garrison Boulevard, which was within Plaintiff's designated area. However, on that overtime shift Plaintiff was deployed to a mobile unit only within the designated area. Then-Lieutenant Yurkovich (White, male) contacted Plaintiff twice, once over the air in which he asked her to give him her cell phone number, and a second time directly at approximately 2210 hours, in which he asked her where she was during the homicide, and she advised him that she was in her designated area. Plaintiff also advised Lt. Yurkovich of the boundaries and area she was responsible for during the shift as a mobile unit.

50. In retaliation for her prior protected activity and because of her race, color, and sex, Lieutenant Yurkovich requested that Plaintiff write an administrative report advising him where she had been. Plaintiff acknowledged the request and then asked if she was the only one being made to write an administrative report. Lieutenant Yurkovich then replied; "this is not coming from me this is coming from Colonel Howe." According to Sergeant Frank Armstrong (Black, male) and primary Officer Montanaro (Hispanic, male), no one else was made to write an administrative report. Similarly situated Sergeants who were not African American, not black, and not female were not required to write an administrative report or scrutinized for their whereabouts during the homicide incident. Plaintiff believes she was ordered to write the administrative report as punishment; she was retaliated against by her

supervisors for her engagement in protected activity, and she was discriminated against by her supervisors because of her race, color, and sex.

51. Colonel Howe asked Lieutenant Yurkovich what Plaintiff's boundaries for the deployment were and the Lieutenant did not know. Lt. Yurkovich kept advising and giving false information in reference to where Plaintiff was deployed, and at no time was she ever given any other information to redeploy or stay "10-7" at any one location. Plaintiff believes her first line supervisor Lt. Yurkovich, and her second line supervisor Colonel Howe were conspiring to falsely reprimand the Plaintiff because of her race, color, and sex; and were discriminating and using the administrative report as retaliation for Plaintiff's prior protected activity.

52. After later reviewing the body-worn camera of Lieutenant Yurkovich, Plaintiff observed Lieutenant Colonel Mark Howe (White, male), Captain Jai Etwaroo (Middle Eastern Descent, brown, male), and Lieutenant Yurkovich (White, male) having an approximately 30-minute conversation on the homicide scene casting the Plaintiff in a negative light and encouraging further scrutiny. The information they talked about was not factual and defamed Plaintiff's character. In the recording, Captain Etwaroo can be heard telling Lieutenant Yurkovich that Plaintiff was giving Lt. Yurkovich "lip service" while on the phone with him. Captain Etwaroo could not have known what Plaintiff said to Lt. Yurkovich on this phone call, because the Lieutenant wasn't standing next to him. Captain Etwaroo didn't ask Lt. Yurkovich if Plaintiff gave him lip service, he simply stated this in a matter-of-fact way. Captain Etwaroo was using Plaintiff's race, color, and sex to advance a negative stereotype and intentionally discriminate against the Plaintiff. Too often, African American, black, women are falsely accused of "lip service" as a derogatory stereotype;

when truly they are confidently articulating their concerns. Nevertheless, Lieutenant Yurkovich was then motivated to further engage in a very unprofessional and derogatory conversation about Plaintiff, specifically using negative stereotypes along with her name, her race, her color, and her sex as motivating factors. Lieutenant Yurkovich stated, "that's why she got kicked out of the District." This was all being recorded and took place on an active homicide scene. The implication that Plaintiff was the reason the double homicide occurred because she was not on the scene, and the false statements in reference to her character and why she was previously involuntarily transferred should not have been public knowledge or known to Lt. Yurkovich along with the details of her EEO case, as she had previously been advised and given a form to sign attesting to its confidentiality.

53. The fact that derogatory stereotypes about the Plaintiff was the topic of discussion instead of the deployment plan moving the District forward and a plan of action to deter any more events from happening was alarming to the Plaintiff, and on May 1, 2022 Plaintiff submitted a hostile work environment complaint to BPD regarding the incident, noting that the video footage speaks to the patterns and practices of discrimination and retaliation by the Baltimore City Police Department against African-American, black, females who engage in protected activity.

54. BPD males, Lt. Col. Howe and Captain Etwaroo planted the seed and motivated Lieutenant Yurkovich to target Plaintiff. Lt. Col. Howe, Captain Etwaroo, and Lieutenant Yurkovich, used the Plaintiff's race, color, and sex, along with her prior protected activity to target Plaintiff in violation of state and federal law and intentional abuse of BPD policy.

55. Captain Etwaroo had previously tried several times to make romantic advances toward Plaintiff, but she refused his advances when he was an Officer. After becoming a Captain,

16

he looked to punish the Plaintiff for rejecting his romantic advances by using his power and position to intimidate her and by sending Lieutenant Yurkovich to surveil Plaintiff. Shortly after these events occurred, Captain Etwaroo gave Lieutenant Yurkovich his cell phone number.

56. While on the active homicide scene, Lieutenant Yurkovich turned off his body worn camera in direct violation of BPD policy, and therefore he has two different camera entries for the same active scene.

57. Since this incident, Plaintiff has been the victim of ongoing harassment, disparate treatment, continued threats and intimidation creating a hostile work environment, retaliation because of her engagement in protected activities, and discrimination because of her race, color, and sex. These unlawful actions by BPD affect Plaintiff's employment in terms of her promotion eligibility, salary, retirement, career advancement, and her health, her mental wellness, and overall work environment. To date, the Plaintiff has been at the top of the Lieutenant promotions list and skipped over ten times for promotion to Lieutenant despite her position on the list of eligible Officers for promotion, in December 2022, as well as each of the following months. Two White male Officers, who were at the bottom of the list and less experienced than Plaintiff were instead selected for the Lieutenant promotion. One of the White male Lieutenant candidates (Sgt. Sagner) had been charged with misconduct on Nov. 25, 2022, only a few days before the start of the leadership school program and ultimately had an EEO complaint filed against him by Lieutenant Bren. Sgt. Sagner (White, male) a similarly situated Sergeant to Plaintiff, who had a white male supervisor that made false misconduct reports to increase his numbers in the Blue Team system was promoted even after Lt. Bren (White, male) charged him

twenty-one times. Lt. Bren was not suspended as a result of having excessively charged Sgt. Sagner. However, unlike Sgt. Sagner, Plaintiff was a similarly situated Sergeant who was not promoted, and unlike the false allegation by Lt. Bren, the Plaintiff was falsely accused of harassing Lt. Lucien. The Defendants refused to resolve the incidents between the Plaintiff and Lt. Lucien (two African American Black females) yet intentionally found a resolution (i.e. the promotion of two white males) for incidents between Sgt. Sagner and Lt. Bren.

58. On December 2, 2022, Plaintiff received a letter vaguely informing her that she was under investigation and that due to the investigation she was being deferred from being promoted. The letter further explained that Plaintiff was still eligible to be on the Lieutenants promotion list, be promoted, and be permitted to take subsequent Lieutenants exams. Plaintiff believed she was being unreasonably skipped on the promotion list as retaliation for making complaints against Lt. Lucien and for an excessive amount of false misconduct charges Lt. Lucien made to increase the Plaintiff's numbers in the Blue Team system. When Plaintiff filed her complaints against Lt. Lucien and BPD, she immediately experienced a pattern of hostility and retaliation from Lt. Lucien and her front-line supervisors. When the Plaintiff asked Col. Kevin Jones and Deputy Commissioner Worley if she had been served a notice of any of the misconduct investigations, they falsely stated that she had. The letter Plaintiff received was vague and provided no clear notice why Plaintiff was under investigation. The letter was used as intimidation, as retaliation, and as an unsubstantiated excuse to refuse Plaintiff a Lieutenant's promotion.

59. The letter Plaintiff received regarding her eligibility for promotion indicated that she could contact EEO Director Olufemi Akanni for more information. Plaintiff called him on the

day she received the letter, and he informed her that her application was deferred for an allegation the Department had received on or before the beginning of July 2022, presumably referring to unsubstantiated texting and driving allegations from an anonymous complainant. He advised her that BPD was conducting an investigation to see if they could arrest her or not, threatening her with criminal actions, and adverse employment actions.

60. On February 7, 2023, Plaintiff received a "not sustained" letter of finding from the Public Integrity Bureau ("PIB"). Upon asking Captain Brust (White, male) if she would be promoted before the list expired, and Plaintiff was advised she was being deferred from promotion for the third time. She was advised that the department was doing promotions; however, she was not eligible to get promoted. Plaintiff asked why no one had informed her that she was being deferred as she was still full duty but was not given a letter advising she was being deferred.

61. On February 13, 2023, Plaintiff was again deferred from being promoted allegedly because of "egregious or serious acts of misconduct" but she was never informed of why or what misconduct allegations had specifically been raised.

62. Plaintiff reached out to Deputy Commissioner Richard Worley to inquire about the reasons for failing to select her for promotion, and he advised her that he would respond the following week but never followed up.

63. Upon information and belief, other non-African American/non-Black, male Officers and Officers who have not engaged in protected activity have been selected for promotion despite having charges and misconduct allegations brought against them. It is common practice for BPD to promote non-African American/non-Black Officers with open and active investigations:

19

a) Sgt. Melvin Santiago (Hispanic, brown, male) is on the Lieutenants promotion list, shares similar work responsibilities as the Plaintiff, and was previously suspended for three years for allegations of stealing money and misconduct related to drug seizures. However, unlike the Plaintiff he was still promoted and moved to the Chief Patrol's office and was on the Lieutenants promotion list ahead of Plaintiff, even though Plaintiff has more years of active service, no misconduct suspensions, and duty accomplishments as an officer.

b) Sgt. Naisha Garcia (Hispanic, brown, female, no known prior protected activity) was on the Lieutenants promotion list, shares similar work responsibilities as the Plaintiff, and has an active open EEO complaint against her for discrimination against Black male applicants. Sgt. Garcia attended Lieutenant's School with the Plaintiff. However, unlike the Plaintiff, Sgt. Garcia was advised that she was being promoted, and the Plaintiff was not, while sitting at the same table with Plaintiff during the promotion ceremony.

c) Lieutenant Christopher Merino (Hispanic, brown, male) was also promoted to Captain despite having two open EEO complaints against him.

d) Lt. Donald Slimmer (White, male) worked in the Eastern District when he began targeting Officer Trina Slaughter (Black, female), falsely charging her with misconduct nine times in one month despite the fact that she had a Sergeant who directly supervised her duty of service. Upon information and belief, Officer Slaughter subsequently filed an EEOC complaint against Lt. Slimmer, but to avoid backlash from the investigation findings the Department devised a coverup scheme that moved Lt. Slimmer to another

District and intimidated Ofc. Slaughter to drop her complaint or be subjected to retaliation for engaging in protected activity.

e) Plaintiff also filed a complaint against then-Lt. Sturm (White, female) in 2015 because she physically assaulted Plaintiff during riots, and her husband who worked at Internal Affairs, used a similar coverup scheme to intimidate and threaten the Plaintiff to drop her complaint or be subjected to retaliation for engaging in protected activity. Plaintiff has never received any response of the outcome of that complaint. However, Lt. Sturm was promoted to Captain shortly after as a way to cover up the incident by outranking the Plaintiff and keeping then-Captain Strum above reproach. She later retired from the job, but upon information and belief, was allowed to come back on a contractual basis.

f) Lt. Brian Horton (White, male) was Plaintiff's Lieutenant in 2000 when he witnessed another White male officer use a derogatory racial slur by calling the Plaintiff a N****R. Plaintiff reported such incident to her supervisor, Lt. Horton. Lt. Horton was advised of the incident and failed to address Plaintiff's concerns. Again, the coverup scheme was deployed to avoid any negative backlash from an investigation into the racially charged incident, and Lt. Horton was moved from the Northwest District before he retired soon after. Upon information and belief, the Department allowed him to come back, and he now works in recruitment.

64. Plaintiff was also subjected to retaliation when she filed charges against her supervisor Lt. Lucien for physical assault and for failure to inspect her service weapon for any entire year. Shortly after she filed the charges, BPD put out a guidance on how to perform weapons inspections but did not acknowledge that it was prompted by the Plaintiff's charge. On March 3, 2022, Lt. Lucien filed multiple counter complaints against Plaintiff despite the

fact that she wasn't working underneath her at the time, as retaliation for the charges Plaintiff filed against her. Plaintiff received notifications on December 12 and 13, 2022 that her internal complaints 2021-1743 and 2022-0383 did not meet the burden of proof for her allegations and her charges were effectively dismissed.

65. On or about February 16, 2023 Plaintiff contacted Equity Officer Blythe to advise her of what was going on and for assistance with her complaints of discrimination, retaliation, and harassment. In retaliation for her due diligence in seeking assistance from Equity Officer Blythe, Plaintiff was suspended pending termination on February 28, 2023.

66. On February 21, 2023, Plaintiff received a Notice of Investigation from BPD informing her that she was being charged with having a conversation with an Internal Affairs/PIB detective about an active case. Upon information and belief, BPD used these false allegations to ignore the Plaintiff's eligibility for promotions and waited for the promotional exam to come out before charging Plaintiff, knowing it could take over a year for the Department to investigate.  This gave BPD further justification to continue to skip over Plaintiff on the new lists for Lieutenants promotion.

67. On August 24, 2023, at approximately 0930 hours Sergeant Cheaneka Green (Black, female) called Plaintiff's departmental cell phone and advised her that she was told to have her respond to a new assignment (Adult/Juvenile Booking) without any written orders. There was no signed order, no email disseminated with Plaintiff's name on it advising of her official transfer. Relying on a recent compliance email that was disseminated in reference to people moving and going to different units without a Colonel's approval or being properly notified before going to new units. Since the Plaintiff was never advised of the date and time, she was supposed to report to Adult/Juvenile Booking; the Plaintiff in

fear of retaliation or being the scapegoat for misconduct and disciplinary actions refused the new assignment because it lacked written orders and directly defied the recent compliance email. Plaintiff was put in a position that left her no option but to rely only on written orders. However, due to her refusal and compliance with BPD policy, the Plaintiff was again threatened with a suspension pending termination as retaliation for protected activity. Plaintiff believed she was being targeted by BPD hostilities as retaliation because she would be reprimanded if she followed the unreliable orders and she would face suspension pending termination if she refused to follow the unreliable orders. This created a hostile working environment for the Plaintiff that other non-African American, non-black, male Sergeants did not have to experience.

68. When Sergeant Green first said she believed Plaintiff was being moved to Adult/Juvenile Booking, Plaintiff asked her if she was advised of the date and time, and Sgt. Green was not properly advised nor provided any written orders. Immediately after this conversation, Plaintiff began reaching out to Lieutenant Rosemary Ford (Midnight Shift Commander, who was scheduled to retire on September 1, 2023) and Sergeant Michael Hobson (Admin Sergeant, Adult/Juvenile Booking) in reference to the move for more information on her rumored move to this new assignment. Neither Lieutenant Ford nor Sergeant Hobson had any written notification such as a signed order, or any knowledge of the date or time Plaintiff was supposed to report to Adult/Juvenile Booking and leave her current assignment at that time (Southern District). Plaintiff continued to speak to both Lieutenant Ford and Sergeant Hobson over the course of several days trying to obtain more information regarding the move because the Plaintiff feared retaliation or discriminatory misconduct and disciplinary actions for leaving her currently assigned command to respond

23

to a new command without proper written orders and being noncompliant with written policies of the Baltimore Police Department.

69. In the past, the Baltimore Police Department would discriminatorily target and charge certain Officers for responding to new assignments without proper orders. Non-African American/non-black male Officers were and are allowed to disregard signed orders and even decide where they want to go without being charged. Unlike other non-African American/non-black male officers, Plaintiff did not want to be charged with misconduct for leaving her assignment without proper documentation and the Plaintiff feared she would likely be targeted again and charged falsely for misconduct. Sergeant Hobson confirmed that he did not have any written and signed order indicating when Plaintiff was to report to Adult/Juvenile Booking, what shift she would be working, or if it was a detail or transfer. This information would have been on a signed order and would have given Plaintiff clear and concise instructions as to what her assignment would have been and most importantly what date and time she was to report to Adult/Juvenile Booking.

70. Nevertheless, Lieutenant Colonel Mark Howe (White, male), in an act of retaliation, used his authority as a Lieutenant Colonel to have Sergeant Melvin Santiago (Hispanic, brown, male) charge Plaintiff with misconduct for not responding to Adult/Juvenile Booking even though he had actual personal knowledge there was no signed order to enforce. Sergeant Santiago then proceeded to lie and say there was a signed order but was unable to show proof of a signed order. He sent Sergeant Green a fabricated order that had Plaintiff's name on it, however, it was not signed and had not been disseminated via email. Lt. Colonel Howe and Sgt. Santiago conspired to intimidate the Plaintiff with falsified misconduct

charges and then fabricated evidence in retaliation for Plaintiff's refusal to violate BPD written policies and as retaliation for Plaintiff engaging in protected activities.

71. Lieutenant Colonel Howe had independent personal motivation to retaliate against Plaintiff because she has an active complaint against Lt. Col. Howe. As noted previously, Lieutenant Colonel Howe, along with now-Captain Kurt Yurkovich and Captain Jai Etwaroo were knowingly discovered on body-worn camera system discussing Plaintiff's EEOC case while at an active double homicide scene. Captain Yurkovich can be heard saying; "that is why she got kicked out of the Northwest District". Furthermore, Plaintiff's name was mentioned several times in a negative light, and the co-conspirators gave inaccurate information about the Plaintiff in reference to her whereabouts before and during the incident, implying she was the reason the double homicide occurred and her race, color, and sex were motivating factors to publicly humiliate and target the Plaintiff.

72. Lt. Colonel Howe then proceeded to call Plaintiff's direct supervisor Lieutenant Battle (Black, male) and order him to retrieve Plaintiff's administrative report before she finished her tour of duty. Lt. Battle became Plaintiff's supervisor after she was involuntarily moved from the Northwest District to the Southern District following months of working in a hostile environment under Lt. Lucien, who escalated her discriminatory treatment of the Plaintiff with physical attacks and retaliation against Plaintiff for engaging in protected activities during the course of time that Plaintiff worked directly under Lt. Lucien in the Northwest District.

73. Other non-African American/non-Black Officers, male Officers, and/or Officers who have not previously engaged in protected activity have not faced fabricated disciplinary actions for failing to follow transfer orders.

a) Upon information and belief, on or about November 12, 2021, Lieutenant Jessica Leitch (White, female) was transferred from the Communications Section to Southwest District Patrol. However, Lieutenant Leitch failed to comply to written orders detailing her new assignment and she never went to the Southwest District. Yet she was never charged for misconduct or put in the Blue Team system for not following a written and signed order. In contrast, Plaintiff was not provided with any written signed order, nor was she advised by a Colonel or above to respond to the Adult/Juvenile Intake facility prior to the morning before Lieutenant Colonel Mark Howe conspired to retaliate against the Plaintiff by ordering then-Sergeant Santiago to have Plaintiff placed in the Blue Team system for not responding to an unreliable assignment. Lt. Miller attempted to challenge this discriminatory treatment but was threaten by Sgt. Santiago not to get involved because the Lt. Col. Howe would be upset and further retaliate. This affirms Plaintiff's belief that she was being retaliated against by her supervisor and intimidated by her fellow officers for engaging in protected activity.

74. On February 28, 2023, Plaintiff was advised that she was suspended pending termination. When Lieutenant Sean Miller (White, male) was advised by Captain Michael Newton (White, male) to suspend Plaintiff, Plaintiff asked Lieutenant Miller why she was being suspended but he was unable to give her a reason, stating that he didn't fully understand why Plaintiff was being suspended but that he had been ordered to do so by Captain Newton. Plaintiff reported to Lieutenant Miller that her rights were being violated and that her police powers could not be taken away from her without being officially advised why. Plaintiff surrendered her equipment against her will and was then transported to the Public Integrity Bureau ("PIB") for further investigation.

75. Once Plaintiff arrived at PIB, she observed Captain Etwaroo standing out front at the doorway of The Public Integrity Bureau with Sgt. Batey. Plaintiff felt this was an attempt to intimidate and humiliate her for engaging in protected activities. Once inside the building, Plaintiff and Lieutenant Beaver were waiting in the lobby area for instructions for at least fifteen minutes, but no one advised Plaintiff of why she was being suspended. Then Captain Newton came out to the foyer to get them and take them to the conference room where they sat for about fifteen or twenty minutes more, but still no one advised Plaintiff why she was being suspended. Captain Newton left again for approximately fifteen or twenty more minutes, and when he returned Plaintiff informed him that no one told her why she was being suspended and that it was a violation of her rights.

76. Plaintiff and Lt. Beaver sat and waited again, at which time Captain Newton finally came into the room and asked Plaintiff if anyone had advised her of why she was suspended. She again informed him that she was not told why she was being suspended. Plaintiff was then told she was being suspended pending termination. She asked Captain Newton who made that decision to have her suspended pending termination, and Captain Newton indicated that it was "the DRC." Plaintiff requested that he tell her what those letters stood for, and he replied that it was the Disciplinary Review Committee. Plaintiff asked him to tell her who sits on that board, as she had the right to know who decided to take her police powers and was attempting to take her job from her. Captain Newton initially told Plaintiff he didn't know who sat on the board. She persisted and asked again, and he told her he couldn't tell her who sat on the board.

77. Plaintiff was later able to ascertain that then-Lieutenant Mark Howe (White, male) who had an active complaint against him by the Plaintiff, Major Latonya Bishop, and Captain

Michael Newton sat on the board and made the decision to have her suspended pending termination. Lieutenant Mark Howe should not have been sitting on a board that decided any form of punishment as it pertains to Plaintiff since she has an active case pending against him and his inability to be impartial is in furtherance of his retaliation against the Plaintiff for engaging in protected activities.

78. Major Latonya Bishop was like a sister to Plaintiff. They met in 2007 when Plaintiff was promoted to Sergeant and assigned to the Western District. They developed a friendship because she observed Lieutenant Robert Booker (Black, male) treating the Plaintiff unfairly and blatantly denying her opportunities that the other supervisors were allowed to have, such as the opportunity to learn and be trained to run the shift as the shift commander. Lieutenant Booker requested the Plaintiff be his driver and she advised him that she did not feel comfortable driving him around as a newly promoted female Sergeant due to the possible perception of inappropriate behavior. When Plaintiff declined his request, he began to target her with discriminatory treatment because she was female.

79. Major Bishop was a Sergeant at the time, and she befriended Plaintiff. They became friends and even called one another sisters. In 2021 during Plaintiff's time being further targeted by the Commanders of the Baltimore City Police Department, Major Bishop abruptly stopped being her friend. Plaintiff made several attempts to find out why. At one point in the friendship Major Bishop told Plaintiff it was difficult for her to be her friend because none of her other police officer friends liked her. As such, Major Bishop also should not have sat on any board that determined Plaintiff's status because her inability to be impartial is in furtherance of the intimidation and discriminatory treatment against the Plaintiff for engaging in protected activities.

80. Plaintiff was further punished because the grant-funded take-home car program, which enabled her to have a marked car present in front of her home and in her neighborhood as a deterrence, was removed from her neighborhood. This negatively affected the neighborhood and escalated hostile working conditions for Plaintiff, who feared her safety.

81. Plaintiff passed the Lieutenant's exam with exceptional achievement and was first eligible for promotion to Lieutenant on December 2, 2022, but she was skipped four times on the promotions list. On February 14, 2023, the Lieutenant List of 2022 expired. In 2023, the new Lieutenants promotions list was published with Plaintiff's name, but Plaintiff was again skipped six times for promotion despite her eligibility. In 2024, Plaintiff was listed as #2 on the Lieutenants promotion list. However, the Plaintiff's name was unjustly removed from the promotions list by Deputy Commissioner Brian Nadeau, and she was again denied a promotion that she successfully tested and worked hard to obtain for the previous three years. Plaintiff later discovered she was removed from the promotions list due to false charges against her.

82. There were non-African American/non-Black male Officers, and/or Officers who have not previously engaged in protected activity on the same list who had open and active EEO cases against them yet they were promoted, and the Plaintiff was not:

   a) Lieutenant Ryan Beaver (White, male) and Lieutenant Edelman (White, male) were both named on the Lieutenants promotion list below Plaintiff, shared similar work responsibilities as the Plaintiff, shared the same first- and second-line supervisors as Plaintiff, but were both promoted ahead of Plaintiff and moved to be her supervisors. There were several openings for Lieutenants, and Defendants chose to have Lt. Edelman detailed to Adult/Juvenile Booking, and then out of all the Sergeants assigned

there, Plaintiff was the only one reassigned to be supervised by Lt. Edelman in Workday, which upon information and belief was intentionally done to further humiliate Plaintiff. Plaintiff had far superior experience and years of active-duty service than Lt. Edelman, yet she was assigned to report directly to him in retaliation for engaging in protected activities. As the supervisor of Plaintiff's Workday reports, Lt. Edelman has the authority to monitor and approve the Plaintiff timesheet and time-off requests.

b) Lieutenant Jeremy Sagner (White, male) was on the same Lieutenants promotional list, shared similar work duties as the Plaintiff, and was facing similar charges as Plaintiff by being falsely accused of misconduct by his Lieutenant. However, unlike Plaintiff he was allowed to be promoted and is currently a full duty Lieutenant because of his race (Caucasian), color (white), and sex (male). Unlike Plaintiff, orders were sent down directly from Deputy Commissioner of the Public Integrity Bureau, Brian Nadeau, demanding that then-Sergeant Jeremy Sagner not be targeted any longer and be allowed to be eligible for the Lieutenants promotion. Plaintiff and Lt. Sagner were similarly situated employees of the Defendants in similar situations but were not treated the same way because of race, color, and sex.

c) Sergeant Easley (Brown, male) was on the same Lieutenants promotion list, shared the same work duties as the Plaintiff, and had an open EEO case. However, unlike Plaintiff he was allowed to be eligible to be promoted because of his color (brown) and sex (male), and he is currently a Lieutenant in the Baltimore City Police Department.

d) Sergeant Charles Smith (White, male) was on the Lieutenants promotion list prior to Plaintiff, shared the same work duties as the Plaintiff, and he had several sustained

EEOC complaints against him that were reversed by the order of Deputy Commissioner, Brian Nadeau. Upon information and belief, Director Olufemi Akanni of the Equal Opportunity & Diversity Section sustained at least one of many complaints against Sergeant Charles Smith, but then he was ordered by Deputy Commissioner Nadeau to change the findings. Unlike the Plaintiff, Sergeant Charles Smith was then allowed to be eligible for promotion to Lieutenant because of his race (Caucasian), color (white), and sex (male). Lieutenant Charles Smith is currently assigned to the Central District and has since had several EEO complaints lodged against him that are being overlooked because he is a white male violating the rights of black officers and citizens.

83. On several occasions during the promotional process, Lieutenant Michael Baker (Black, male) who is assigned to the Northern District, where Plaintiff was involuntarily moved, made disparaging jokes in the Northwest District about Plaintiff regarding her failed promotions and the fact that the Department has continued to deny Plaintiff her promotion. Upon information and belief, Lieutenant Paul Thompson of the Northwest District has also made public comments and engaged in disparaging conversations in the District about Plaintiff being skipped over on the Lieutenants promotion list.

84. On February 15, 2023, the current Lieutenants promotion list was made available, and Plaintiff was on the list as well. She was sitting at the number two position on this list and she was still sitting suspended pending termination on charges that are false and unsubstantiated. Plaintiff requested a meeting with Equity Officer Leslie Parker Blyther on or around February 16, 2023 to advise her of the situation, and on February 28, 2023, Plaintiff was suspended pending termination. This action not only denied Plaintiff the right

to get promoted but also bars her career opportunities in the future due to a policy put in place by Commissioner Harrison that indicates that an Officer with a sustained finding cannot be promoted for three years after the sustained finding.

85. After Plaintiff was suspended, she was told that she didn't need a suspension hearing, which is the typical protocol, but the Plaintiff had to demand one. The Baltimore City Police Department has demonstrated a pattern and practice of denying African American/Black Officers, female Officers, and/or Officers who have previously engaged in protected activity their right to a suspension hearing, among other liberties that should be afforded to the Officers in the police department.

86. Plaintiff was also denied her right to participate in the early intervention program which is available to Officers who have accumulated a number of charges in the Blue Team system. The Defendants failed to provide the Plaintiff an opportunity to participate in the intervention. The Plaintiff has personal knowledge of the intervention program and its eligibility because she used to be the supervisor of the program who was responsible for drafting the Intervention Write-ups. Unlike other non-African American/non-black, non-female Officers, the Plaintiff was denied her due process right to participate in the intervention program where she could have documented and communicated her discriminatory concerns in a safe environment. Instead, Plaintiff was forced to report her discrimination claims and engage in protected activities in fear of her safety and well-being.

87. Plaintiff was being targeted, and she feared for her safety as she has been stripped of her powers and continues to be targeted by management and supervisory officials who are full duty and have the power to determine her fate. Plaintiff was involuntarily transferred and

threatened with false misconduct charges, despite the fact that she has never been in trouble or charged with any substantiated misconduct that has been sustained. In her almost twenty-seven years in the Department, she has never been charged by anyone but the Baltimore City Police Department. No civilians had filed complaints against Plaintiff until the Defendants recently conspired to anonymously file an initial complaint against the Plaintiff, and the complaint was ultimately not sustained. Plaintiff believes this anonymous complaint is retaliation for the Plaintiff filing this complaint against the Defendants and for her prior engagement in protected activities. Furthermore, Plaintiff has made attempts to meet with the Mayor to resolve these discrimination and retaliation issues, to no avail.

88. In April of 2022, Plaintiff was involuntarily transferred from the Northwest District to the Southern District as punishment for prior engagement in protect activities. When she was told she was originally being moved to the Central District, she advised Colonel Herzog that she couldn't be sent to the Central District because she had previously been targeted by Lieutenant Thomas Mistysyn Jr. (White, male), Sergeant Ethan Newberg (White, male) and Major Kiera Saunders (White, female) while working in the Southwest District. Both Lt. Mistysyn and Sgt. Newberg have both been allowed to retire in lieu of being punished for inappropriate behavior. Lt. Mistysyn had several EEO complaints against him and all had been sustained. Unlike Plaintiff, he also had cases sustained against him prior to being promoted to Lieutenant, but he was still allowed to be eligible for promotions. Sgt. Newberg made threatening statements to other Officers about the Plaintiff in reference to an intimidation tactic used to motivate them to "get her", and disparaging remarks. Sgt. Newberg told Sgt. Anderson that if he was not present, "we would get her!" Plaintiff was lucky that Sergeant Charles Anderson was in the Southwest District because if he was not,

they would've "taken care of" her. These intimidation tactics were a common practice of the Defendants and were used as a bounty that created further hardship, increased surveillance, and targeted discrimination on the Plaintiff because of her prior protected activity. Furthermore, this pattern and practice was used to scare any person who revealed wrongdoings in the Baltimore Police Department, and co-conspiring bad actors were incentivized with promotions to higher ranks and less scrutiny if they targeted persons who engaged in protected activities.

89. During Plaintiff's time at the Southwest District, she filed a complaint against then-Captain Donald Diehl (White, male) who was targeting her and admitted that he knew that there were other supervisors that were targeting the Plaintiff, and he failed to do anything about it. Captain Diehl was promoted to Major and moved to Public Integrity Bureau (PIB), where Plaintiff began to get an unprecedented amount of misconduct charges at one time.

90. In 2019, Plaintiff interviewed for a position in Special Investigations Sections and was denied the position because she had five open complaints against her. Most of them were false misconduct charges from Lieutenant Mistysyn that were not sustained, and one was from Lieutenant Cormegna (White, male) from the Northern District. Lieutenant Cormegna is no longer at the Baltimore Police Department. Per BPD policy, Plaintiff should have been placed in an early intervention program because she had multiple cases under investigation within a certain time frame. If the Department knew these were valid cases, Plaintiff met the criteria to be placed in an early intervention program, but she was not. These charges were weaponized against Plaintiff and used in retaliation as an excuse to not allow Plaintiff to advance in her rank and career, and the false misconduct charges lodged against the Plaintiff were used to terminate the Plaintiff on September 10, 2024.

91. Plaintiff has been the target of discrimination, harassment, retaliation, and violations of her statutory rights. The aforementioned misconduct was so egregious and pervasive that it has affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways.

92. The effects of the hostilities and pressure placed on people who aspire to advance in their careers at the Department has affected Plaintiff greatly as the victim of retaliation by Defendants. Plaintiff is being isolated, disparagingly labeled as enemy number one, and hostilely treated as an outcast.

   a)  For example, Captain Joanne Wallace (Black, female) was a friend to Plaintiff for years until Capt. Wallace began to move up the career ranks. Subsequently, Capt. Wallace falsely charged Plaintiff with a misconduct charge that was not sustained, after Plaintiff cancelled her own vacation day so Capt. Wallace could be off work to care for her sickly elder parents.  Nevertheless Capt. Wallace came into work on the day the Plaintiff cancelled her scheduled day to charge Plaintiff for a conversation she was having with another Lieutenant.

   b)  Additionally, Lt. Lucien was a colleague Plaintiff had spoken with on good terms while she was an Officer. However, when Lt. Lucien was promoted from Sergeant to Lieutenant, she also began to submit false misconduct charges against Plaintiff that were later investigated and either designated as unfounded or not sustained.

93. Due to the Defendants' unlawful discrimination and falsified allegations of Plaintiff, she was unreasonably made ineligible for Lieutenants promotions and Plaintiff was deprived of her rightful career advancements. Plaintiff would have been eligible to interview for a Captain's promotion six (6) months after being promoted to Lieutenant. Plaintiff would have been eligible for a Major's promotions six (6) months after being promoted to

Captain. Each ranking offered an increase in earnings, additional specialized training, and increased respect within the ranks of the Baltimore Police Department.

94.  On December 14, 2023 Plaintiff was forced to file suit based on her Second Charge No. 531-2025-02973 due to the Defendants' inability and refusal to remedy its unlawful conduct, which has cost Plaintiff significant financial strain as well as emotional distress. See Civil Action No. EA-23-3395.

95.  However, on December 31, 2024, Civil Action No. EA-23-3395 was dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

96.  On July 18, 2024 an Administrative Hearing was convened pursuant to Law Enforcement Officer's Bill of Rights and Public Safety Art. 3-101, et. seq., to consider administrative charges filed against the Plaintiff based on a March 3, 2022 administrative report to the Equal Opportunity & Diversity Section authored by Lt. Monique Lucien alleging Plaintiff frivolously filed eight complaints of misconduct against Lt. Lucien in retaliation for taking legitimate supervisory actions.

97.  A five-member board with two civilians was impaneled to consider the charges alleged against the Plaintiff, and an Administrative Law Judge presided over the hearing.

98.  All of the allegations against Lt. Lucien were not investigated by the Public Integrity Bureau but were reviewed by the impaneled board during the administrative hearing.

99.  The administrative hearing board took into consideration all evidence presented, opening and closing statements and testimonies from witnesses before issuing its findings and determining the Defendants did not prove by a preponderance of the evidence that Plaintiff was guilty of retaliation on all eight charges. Based on all the evidence provided

and discussions the board was convinced that the Plaintiff was <u>not</u> guilty and believed she was making several complaints to show a pattern of harassment and hostilities in multiple interactions with Lt. Lucien and her commanding officers or anyone else that intervened from BPD.

100. The administrative hearing board findings of fact and conclusions of law, following consideration of evidence presented as to punishment, recommended to Police Commissioner Richard J. Worley that Plaintiff receive a simple letter of reprimand, one day loss of leave, and psychological services.

101. However, on September 10, 2024 Police Commissioner Worley issued the Plaintiff a termination letter despite the administrative hearing board's final decision and recommended punishment on July 18, 2024.

102. Police Commissioner Worley reviewed the entire administrative hearing record and in retaliation, he increased the disciplinary recommendations and verbally terminated Sgt. Glanville, without providing her a written termination letter. Sgt. Glanville was mentally shocked and emotionally distressed that she was being terminated after 28 years of service duty with BPD. Failure to immediately provide an explanation and grounds for termination was malicious and caused irreparable harm to Sgt. Glanville, her career, and reputation. In disbelief, Sgt. Glanville demanded a written letter of termination, so a few days later Sgt. Glanville was presented with a back dated (September 10, 2024) written letter of termination signed by Commissioner Worley.

103. On September 27, 2024, Plaintiff, by and through her Union representative, filed a petition in the Circuit Court for Baltimore City to appeal the administrative hearing board's decision. See Case No. C-24-CV-24-003051.

104. On May 20, 2025 a hearing was held in front of an administrative judge who opined, ordered the reversal of the Administrative Hearing Decision that found Plaintiff guilty on one of the eight alleged charges and the Commissioner's termination decision, and ordered the Plaintiff's employment be immediately reinstated with cost on the Department.

105. Yet, the Defendants BPD has refused to reinstate the Plaintiff's employment and continues to deny her the remedies ordered by the Circuit Court for Baltimore City.

106. Due to the discriminatory and unlawful treatment Plaintiff has endured, she has experienced lasting harm that is ongoing to this day and were escalated by the Plaintiff's termination on September 10, 2024 after risking her life as an active-duty service Officer for the Baltimore Police Department for more than twenty-eight years.

107. The Defendants' discriminatory and unlawful practices have been effectuated in violation of Title VII, the MFEPA, and Section 1981/1983.

## COUNT I

### VIOLATION OF TITLE VII - RACE DISCRIMINATION

108. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

109. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for the position; (3) Plaintiff suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

110. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is an African American female and is considered a member of a protected

class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as she has approximately twenty-eight (28) years on the force and had no serious disciplinary issues or misconduct charges sustained that would disqualify her from Lieutenants' promotion list eligibility. Plaintiff suffered adverse employment actions directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when her supervisors and BPD upper management denied her trainings and career advancements, publicly harassed and demeaned her before other Officers, involuntarily transferred her as punishment for engaging in protected activities leaving her worse off with respect to employment terms or conditions, opened false and un-sustained misconduct charges against her to increase her numbers in the Blue Team system, repeatedly denied her the Lieutenants promotion opportunities to which she was eligible, threatened her with termination, unlawfully terminated the Plaintiff in September 2024 despite the recommendations of the administrative board, and refused to reinstate her employment despite the Circuit Court's order. As described above, Plaintiff's colleagues and comparators of different races experienced different and more preferable treatment as compared to Plaintiff, and they did not suffer any adverse employment actions because of their race or color.

111.    Plaintiff is a member of a protected class as an African American female.

112.    Because of her race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, including her September 2024 termination from the Baltimore Police Department in violation of Title VII.

113.    Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

114.    Defendants knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her race.

115.    Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race. For example, Captain Jennifer McGrath (white, female) was promoted to the rank of Major by BPD in November 2023, just nine days after she was formally charged with one count of criminal harassment through electronic communication in Baltimore County, and despite an active internal affairs investigation by BPD's Public Integrity Bureau in October 2023.

116.    Despite BPD's Disciplinary Policy stating, "violations relating to harassment of non-member citizens is classified as an egregious or serious act of misconduct," and "members who engage in egregious or serious acts of misconduct shall be deemed ineligible for promotion for no less than a period of two years following the completion date of the assessed penalty." BPD responded to FOX45 News that "an allegation may or may not preclude a member of BPD from a promotion."[3] Yet, on February 13, 2023, Plaintiff was again skipped from being promoted allegedly because of "egregious or serious acts of misconduct" but she was never informed of why or what misconduct allegations had specifically been raised.

117.    Defendants falsely punished, reprimanded, and harassed Plaintiff in a way that deprived her of workplace safety, promotions, career advancements, increased earnings, and otherwise adversely affected her status as an employee because of her race.

---

[3] Gary Collins, FOX45 News, *"Baltimore police officer promoted despite pending harassment case: 'I could make you disappear.* Published Wednesday January 3, 2024.

118.     Other employees who were similarly situated, but were non-Black or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

119.     Plaintiff's race was a determining factor in Defendants' unlawful conduct toward Plaintiff.

120.     Plaintiff's race was a motivating factor in Defendants' unlawful conduct toward Plaintiff.

121.     The reasons proffered by Defendants for its unlawful conduct are pretextual and Defendants cannot further offer any legitimate reason for its unlawful conduct.

122.     Defendants' aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

123.     Defendants discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

124.     Defendants are directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

125.     As a direct and proximate cause of Defendants' conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, earned leave (PTO) payments, lost career opportunities, lost future earnings, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

126.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

127.     Further, Defendants' treatment and actions are ongoing, and escalated to the unlawful termination of Plaintiff's employment with the Baltimore Police Department in September 2024.

128.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

129.     Similarly situated non-Black or Caucasian employees were not subjected to the same, similar, or any adverse treatment as Plaintiff due to their race.

130.     Baltimore City Police Department must comply with Title VII, but by and through its conduct, has violated Title VII.

## COUNT II

### VIOLATION OF TITLE VII - COLOR DISCRIMINATION

131.     Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

132.     A *prima facie* case of color discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

133.  Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is a Black African American female and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff

is a qualified police officer, as she has approximately twenty-eight (28) years on the force and had no serious disciplinary issues or misconduct charges sustained that would disqualify her from Lieutenants promotion list eligibility. Plaintiff suffered adverse employment actions directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964, when her supervisors and BPD upper management denied her trainings and career advancements, publicly harassed and demeaned her before other Officers, involuntarily transferred her as punishment for engaging in protected activities, opened baseless and un-sustained false misconduct charges against her to increase her numbers in the Blue Team system, repeatedly denied her the Lieutenants promotion opportunities to which she was eligible, threatened with termination, unlawfully terminated the Plaintiff in September 2024, and refused to reinstate her employment despite the Circuit Court's order. As described above, Plaintiff's non-black or white colleagues and comparators of different colors experienced different and more preferable treatment as compared to Plaintiff, and they did not suffer any adverse employment actions because of their color.

134.    Plaintiff is a member of a protected class as a Black female.

135.    Because of her color, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

136.    Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

137.    Defendants knew that Plaintiff was Black prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her color.

138.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her color.

139.     Defendants falsely demoted, reprimanded, and harassed Plaintiff in a way that deprived her of workplace safety, promotions, career advancements, increased earnings and otherwise adversely affected her status as an employee because of her color.

140.     Other employees who were similarly situated but were non-Black or White individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of their employment and workplace conditions.

141.     Plaintiff's color was a determining factor in Defendants' unlawful conduct toward Plaintiff.

142.     Plaintiff's color was a motivating factor in Defendants' unlawful conduct toward Plaintiff.

143.     The reasons proffered by Defendants for its unlawful conduct are pretextual and Defendants cannot further offer any legitimate reason for its unlawful conduct.

144.     Defendants' aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her color.

145.     Defendants discriminated against Plaintiff because of her color by engaging in, tolerating, or failing to prevent color discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

146.     Defendants are directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

147.     As a direct and proximate cause of Defendants' conduct alleged throughout this

Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary

damages – including, but not limited to, past and future loss of income, benefits, earned

leave (PTO) payments, lost career opportunities, lost future earnings, medical expenses,

and costs – and is entitled to all available legal and equitable remedies.

148.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain

and suffering, and her injury is permanent in nature.

149.     Further, Defendants' treatment and actions are ongoing, and escalated into the

termination of Plaintiff's employment with the Baltimore Police Department in September

2024.

150.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and

loss of career opportunity now and into the future, and all of the other losses stated with

Plaintiff not contributing in any way thereto.

151.     Similarly situated non-Black or Caucasian employees were not subjected to the

same, similar, or any adverse treatment as Plaintiff because of their color.

152.     Baltimore City Police Department must comply with Title VII, but by and through

its conduct, has violated Title VII.

## **COUNT III**

## **VIOLATION OF TITLE VII – SEX DISCRIMINATION**

153.     Plaintiff incorporates all information and allegations contained in the preceding

paragraphs as if fully set forth herein.

154.     A *prima facie* case of Sex discrimination requires a showing of four (4) elements:

(1) she is a member of a protected class; (2) she was qualified for the position; (3) she

suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

155.     Here, the four (4) elements of a *prima facie* case of sex discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified employee as evidenced by twenty-eight years of service with BPD.  The Plaintiff suffered adverse employment actions directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964 when her supervisors and BPD upper management denied her trainings and career advancements, publicly harassed and demeaned her before other Officers, involuntarily transferred her as punishment for engaging in protected activities, opened baseless and un-sustained false misconduct charges against her to increase her numbers in the Blue Team system, repeatedly denied her the Lieutenants promotion opportunities to which she was eligible, threatened with termination, unlawfully terminated the Plaintiff in September 2024, and refused to reinstate her employment despite the Circuit Court's order. As described above, Plaintiff's non-black or white colleagues and comparators of different colors experienced different and more preferable treatment as compared to Plaintiff, and they did not suffer any adverse employment actions because of their color. Defendants have subjected Plaintiff to a pattern of discriminatory disparate treatment that stands in stark contrast to the more favorable treatment received by similarly situated non-African American male employees as asserted above. For example:

a) Lieutenant Jeremy Sagner (White, male) was on the same Lieutenants promotional list, shared similar work duties as the Plaintiff, and was facing similar charges as Plaintiff

by being falsely accused of misconduct by his Lieutenant. However, unlike Plaintiff he was allowed to be promoted and is currently a full duty Lieutenant because he is a white male.

b) Sergeant Charles Smith (White, male) was on the Lieutenants promotion list prior to Plaintiff, shared the same work duties as the Plaintiff, and he had several sustained EEOC complaints against him that were reversed by the order of Deputy Commissioner, Brian Nadeau. Unlike the Plaintiff, Sergeant Charles Smith was allowed to be eligible for promotion to Lieutenant because of his race (Caucasian), color (white), and sex (male).

156.    Plaintiff is a member of a protected class as an African American woman.

157.    Plaintiff's sex was a determining factor in Defendants' unlawful conduct toward Plaintiff.

158.    Plaintiff's sex was a motivating factor in Defendants' unlawful conduct toward Plaintiff.

159.    The reasons proffered by Defendants for its unlawful conduct are meritless and pretextual, and Defendants cannot further offer any legitimate reason for its unlawful conduct and violation of Title VII.

160.    Because of her sex, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

161.    Defendants must comply with Title VII, but by and through its conduct, has violated Title VII.

## COUNT IV

### VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT

162.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

163.     When hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Complainant must show that: (1) she belongs to a statutorily protected class; (2) she was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on her statutorily protected class; (4) the harassment affected a term or condition of employment[4] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

164.     The actions and conduct of the above-described perpetrators as set forth herein created a hostile, offensive and intimidating work environment based upon Plaintiff's race, color, sex, and retaliation for protected activity, and detrimentally affected Plaintiff leading to her termination on September 10, 2024.

165.     The actions and conduct by the above-described perpetrators as set forth herein were severe and pervasive and constituted discrimination based on race, color, sex, and retaliation.

---

[4] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

166.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same race, color, sex, and discouraged participation in protected activity in Plaintiff's position.

167.    Defendants knew or should have known of the harassment, discrimination, intimidation, and disparate treatment described herein. Defendants have failed to address the problems and further failed to implement effective and appropriate measures to stop these acts.

168.    By failing to conduct a prompt and thorough investigation of Plaintiff's allegations of discrimination; failing to redress the discrimination of Plaintiff causing fear of retaliation and intimidation; by intentionally failing to protect Plaintiff from discrimination within the Department; by incentivizing bad actors with promotions, by covering up bad actors' wrongdoings, by punishing Plaintiff more harshly than recommended by the administrative hearing board for her complaints of discrimination and disparate treatment, by threatening Plaintiff's termination, by unlawfully terminating the Plaintiff on September 10, 2024, and by refusing to reinstate her employment despite the Circuit Court's order, the Defendants exacerbated the hostile work environment suffered by Plaintiff and intentionally discriminated against Plaintiff in violation of Title VII.

169.    Defendants' actions, and failure to act, amounted to discrimination under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment abrogates the states' Eleventh Amendment sovereign immunity. Title VII, through the 1972 amendment known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement

remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

170.     As a direct result of Defendants' unlawful acts, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress, and is entitled to all available legal and equitable remedies.

## COUNT V

## VIOLATION OF TITLE VII – RETALIATION

171.     Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

172.     Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

173.     Here, the Plaintiff faced retaliation for the complaints she submitted internally with the Department, and then externally with the EEOC, which ultimately escalated into Police Commissioner Worley's retaliatory termination on September 10, 2024.

174.     Soon after complaining, Plaintiff was subjected to the ongoing unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII. Adverse employment actions included but were not limited to - her supervisors and BPD upper management denying her trainings and career advancements, public harassment and

demeaning her before other Officers, involuntarily transferring her as punishment for engaging in protected activities that left her in worse off employment terms and conditions, opening false and un-sustained false misconduct charges against her to increase her numbers in the Blue Team system, repeatedly denying her the Lieutenants promotion opportunities to which she was eligible, maliciously suspending Plaintiff after reporting complaints, threatening her with termination, unlawfully terminating the Plaintiff in September 2024, and refusing to reinstate her employment despite the Circuit Court's order.

175.    As described above, Plaintiff's non-black or white colleagues and comparators who engaged in protected activities experienced different and more preferable treatment as compared to Plaintiff, and they did not suffer any adverse employment actions because of their race, color, sex, or prior protected activities.

a) For example, then-Sgt. Easley (Black, Male, EEO claim) was promoted to Lieutenant despite having an open EEO claim; while Plaintiff was continuously denied the Lieutenant's promotion as retaliation for her participation in statutorily protected activity.

b) Lieutenant Ryan Beaver (White, male) and Lieutenant Edelman (White, male) were both named on the Lieutenants promotion list below Plaintiff, shared similar work responsibilities as the Plaintiff, shared the same first- and second-line supervisors as Plaintiff, but were both promoted ahead of Plaintiff and moved to be her supervisors.

176.    Defendants subjected Plaintiff to the aforementioned adverse employment actions because of her opposition to the unlawful and discriminatory employment practices of Defendants in violation of Title VII.

51

177.     Defendants, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEO representative, named as a bad actor in the EEO complaint, or otherwise should have known that Plaintiff engaged in the complaint process based on her informal and formal complaint filings. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily protected activity.

178.     Plaintiff's prior protected activity was a determining factor in Defendants' unlawful conduct toward Plaintiff and ultimately escalated into her termination in September 2024.

179.     Plaintiff's prior protected activity was a motivating factor in Defendants' unlawful conduct toward Plaintiff and ultimately escalated into her termination in September 2024.

180.     Similarly situated employees (known prior EEO activity) were not subjected to the same, similar, or any adverse treatment.

181.     Defendants' unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

182.     The reasons proffered by Defendants for its unlawful conduct are pretextual and Defendants cannot further offer any legitimate reason for its unlawful conduct.

183.     Defendants' unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment, which escalated into her termination in September 2024 and subsequent denial to reinstate her employment despite court order.

184.     Defendants' retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her participation in protected activity and opposition to Defendants' discriminatory conduct.

185.    Defendants are directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

186.    Defendants' actions were intentional, reckless, malicious, and pervasive for many years.

187.    As a direct and proximate cause of Defendants' conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – but not limited to, past and future loss of income, benefits, earned leave (PTO) payments, lost career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

188.    Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendants' treatment and actions are ongoing and the proximate cause for her termination in September 2024.

189.    Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

190.    Baltimore City Police Department must comply with Title VII, and by and through its conduct, violated the law.

## **COUNT VI**

### **SECTION 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER SECTIONS 1981 AND 1983 OF THE CIVIL RIGHTS ACT**

191.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

192.     Plaintiff brings a claim of violation of her freedom of speech and freedom of expression under the First Amendment and Fourteenth Amendment to the U.S. Constitution by Defendants and its named Responsible Management Officials, for its acts of retaliation in violation of 42 U.S.C. § 1981 through 42 U.S.C. §1983.

193.     Section 1983 provides an individual the right to sue state government employees and others acting "under color of state law" for civil rights violations. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived the plaintiff of a constitutional right or a right conferred by a law of the United States. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Safar*, 859 F.3d at 245 ("The first step in any such claim is to pinpoint the specific right that has been infringed."). "The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

194.     In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court further explained that "[l]ocal governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. A state agency, however, cannot be sued under § 1983 because a state agency is not a "person" under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

195.    In *Chin v. City of Baltimore*, 241 F. Supp. 2d 546 (D. Md. 2003), this Court held that BPD is subject to suit for violation of § 1983 because it "is too interconnected with the government of the City" to constitute a state agency. *Id*. at 548. Like the court in *Chin*, this court must treat the BPD as a municipal entity subject to suit for purposes of 42 U.S.C. § 1983. *See*, *e.g.*, *Nicholson v. Balt. Police Dep't*, No. DKC-20-3146, 2021 WL 1541667, at *6, 2021 U.S. Dist. LEXIS 75798 at *16 (D. Md. Apr. 20, 2021) (holding that "the BPD, while a state entity under Maryland law, is considered a municipal entity subject to suit for purposes of § 1983"); *Fish v. Mayor of Balt.*, No. CCB-17-1438, 2018 WL 348111, at *3, 2018 U.S. Dist. LEXIS 4222 at *9 (D. Md. Jan. 10, 2018) (holding that "BPD is not entitled to Eleventh Amendment immunity and, as a result, is a 'person' subject to suit under 42 U.S.C. § 1983").

196.    To succeed on a claim under 42 U.S.C. § 1983 against a municipality, a plaintiff must "adequately plead…the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (stating that "it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom"). However, "a municipality cannot be held liable . . . under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018

197.    A plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate

indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter*, 164 F.3d at 217).

198.   The Defendants, and its responsible management officials with supervisory and final policy making authority, under 42 U.S.C. § 1983 are persons who acted "under the color of state law."

199.   Section 1981 of the Civil Rights Act prohibits discrimination on the basis of race in the making and enforcement of contracts, including employment contracts, and applies to state actors such as municipal agencies like the Defendants.

200.   Section 1981 guarantees all persons the same right to make and enforce contracts, including the right to the benefits, terms, and conditions of employment.

201.   State employers, including municipal agencies, are subject to liability under Section 1981 for race-based discrimination in employment decisions. See *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989); *St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987).

202.   A *prima facie* case of discrimination under Section 1981 is established when (1) Plaintiff is a member of a protected racial group; (2) Plaintiff was qualified for the position, promotion, or employment benefit at issue; (3) Plaintiff suffered an adverse employment action, such as denial of promotion, disparate treatment in terms and conditions of employment, or constructive discharge; and (4) the adverse action was motivated by Plaintiff's race.

203.   As an African American, Plaintiff is a member of a protected class.

204.    Plaintiff was qualified for her position as Sergeant and repeatedly found eligible for promotion to Lieutenant rank.

205.    Plaintiff suffered multiple adverse employment actions, her supervisors and BPD upper management denying her trainings and career advancements, public harassment and demeaning her before other Officers, involuntarily transferring her as punishment for engaging in protected activities that left her in worse off employment terms and conditions, opening false and un-sustained false misconduct charges against her to increase her numbers in the Blue Team system, repeatedly denying her the Lieutenants promotion opportunities to which she was eligible, threatening her with termination, unlawfully terminating the Plaintiff in September 2024, and refusing to reinstate her employment despite the Circuit Court's order.

206.    These adverse actions were motivated by race, as evidenced by the pattern of disparate treatment, exclusion from opportunities afforded to non-Black employees, hostilities experienced by Plaintiff, and retaliation for Plaintiff's complaints of discrimination and participation in statutorily protect activities. Defendants, state actors, denied Plaintiff the same rights to make and enforce employment contracts as were afforded to non-Black employees.

207.    Defendants unlawfully deprived Plaintiff of her civil rights in violation of Sections 1981 and 1983 of the Civil Rights Act and the First Amendment when its' management and supervisory officials with final policy making authority conspired to intimidate, create a hostile workplace, and retaliate against the Plaintiff for having engaged in protected activity alleging discrimination on the basis of her race, color, and sex.

208.    This unlawful employment practice was so persistent and widespread it constituted a custom or usage with the force of law to intimidate and punish Plaintiff for exercising her rights and discouraging her as well as others from engaging in protected activities to exercise such rights in the future.

209.    As noted in the alleged facts herein, Defendants treated Plaintiff disparately or pretextually in the terms and conditions of her employment compared with the way non-African American/Black and/or non-female employees, or employees that had not engaged in protected activity, were treated.

210.    As a direct and proximate result of the Defendants' acts, the Plaintiff's constitutional rights were violated. The Defendants deprived the Plaintiff of her right to engage in protected activities, deprived her right to be free from retaliation for exercising her right to engage in protected activities, and deprived the Plaintiff's right to be free from hostile workplace conditions, including but not limited to intimidation, unnecessary surveillance, targeted discriminatory treatment, and retaliatory termination.

211.    As described herein this Complaint, the Plaintiff alleges that because she engaged in protected activities, she was illegally subjected to an official pattern and practice of retaliation, harassment, intimidation, disparate treatment, and hostile workplace conditions.

212.    The acts described above were made and exercised by management and supervisory officials who had final policy making authority, and are part of an institutional practice or custom, constituting an official policy of the Baltimore Police Department to cover up officer misconduct, weaponize discrimination, incentivize bad actors with promotions, and conspire to retaliate against fellow officers who stand up against the Department for their

wrongdoings and violations of their civil rights and those seeking protection from discrimination and retaliation in the workplace.

213.    At all times relevant hereto, Defendants were a governmental unit with final authority to create official policy, and its' authorized decisionmakers acted pursuant to a custom or policy of the Baltimore Police Department. *See Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (citing *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292).

214.    Defendants failed to adopt clear policies and failed to properly train its management and supervisory officials in handling, managing, and protecting employees who engage in statutorily protected activities within the Baltimore Police Department.

215.    Because of her race (African American), color (Black), and sex (female), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under 42 U.S.C. Section 1983 and Section 1981.

216.    Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment, and further deprived the Plaintiff of her liberty to engage in protected activities free from discrimination and retaliation in the workplace.

217.    Defendants knew that Plaintiff had complained of discriminatory and disparate treatment prior to the adverse actions described throughout this Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of her race, color, and sex, and the retaliation that she was subsequently subjected to.

218.    Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race (African American), color (Black), and sex (female), and for her participation in statutorily protected EEO activity.

219.    Defendants have limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities, career advancements, increased earnings, and otherwise adversely affected her status as an employee, because of her race (African American), color (Black), and sex (female), and in retaliation for her statutorily protected activities.

220.    Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than the Plaintiff in the terms and conditions of employment. For example, Lieutenant Jeremy Sagner (White, male) was on the same Lieutenants promotional list, shared similar work duties as the Plaintiff, and was facing similar charges as Plaintiff by being falsely accused by his Lieutenant. However, unlike Plaintiff he was allowed to be promoted and is currently a full duty Lieutenant because of his race (Caucasian), color (white), and sex (male). Unlike Plaintiff, orders were sent down directly from Deputy Commissioner of the Public Integrity, Bureau Brian Nadeau, demanding that then-Sergeant Jeremy Sagner not be targeted any longer and be allowed to be eligible for the Lieutenants promotion. Plaintiff and Lt. Sagner were similarly situated employees of the Defendants in similar situations but were not treated the same way because of race, color, and sex. As a result of the Defendants' discrimination, the Plaintiff was terminated in November 2024 and is still awaiting her earned leave payout.

221.    Plaintiff consistently attempted to report the pervasive culture and custom within BPD of treating African American/Black Officers differently than White Officers, and female Officers differently than male Officers, when it came to promotions, disciplinary actions, and conduct.

222.    Plaintiff's allegations clearly show a custom of discrimination as required by 42 U.S.C. Section 1983 and Section 1981.

223.    The Defendants' conduct was so egregious, so outrageous, and so pervasive that it would shock the consciousness of any reasonable juror or member of the public seeking protection from the Baltimore Police Department. *See generally*, *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (quoting *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005)), *cert. denied*, — U.S. —, 141 S. Ct. 2800, 210 L.Ed.2d 930 (2021).

224.    Plaintiff's engagement in protected EEO activity was a determining factor in Defendants' unlawful conduct toward Plaintiff and resulted in her termination in November 2024.

225.    The reasons proffered by Defendants for its unlawful conduct are pretextual and Defendants cannot further offer any legitimate reason for its unlawful conduct.

226.    Defendants' aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American), color (Black), and sex (female), and was in retaliation for her protected conduct.

## COUNT VII

## VIOLATION OF THE MARYLAND FAIR EMPLOYMENT PRACTICES ACT (MFEPA)

227.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

228.    The Maryland Fair Employment Practices Act (MFEPA), Md. Code Ann., State Gov't, § 20-601 *et seq.* outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

229.     Under the MFEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.  Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

230.     Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

231.     Pursuant to Md. Code, State Gov't Art. § 20-903, MFEPA does not allow the state, its officers, and its units to raise sovereign immunity as a defense in an employment discrimination case. There is nothing in the Maryland Code related to claims of employment discrimination filed by a police officer, who is a public employee, against her employer, the Baltimore Police Department, which is a public employer. This is not a case a civilian is bringing against a law enforcement entity—this is a case about an aggrieved employee bringing an employment discrimination and retaliation complaint against her employer for its actions against her in the scope of her employment. Just like a police officer can bring a federal discrimination claim against her employer under Title VII of the Civil Rights Act, a parallel state claim can be brought on the same basis. Because Plaintiff's MFEPA claims are part of the same case or controversy as her Title VII claims, the Court should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

232.     Here, the Plaintiff was subjected to harassment or offensive conduct that is based on race, color, and sex, when her supervisors and BPD upper management denied her

trainings and career advancements, publicly harassed and demeaned her before other Officers, involuntarily transferred her as punishment for engaging in protected activities, opened baseless and un-sustained false misconduct charges against her to increase her numbers in the Blue Team system, repeatedly denied her the Lieutenants promotion opportunities to which she was eligible, threatened her with termination, unlawfully terminated the Plaintiff in September 2024, and refused to reinstate her employment despite the Circuit Court's order. As described above, Plaintiff's non-black or white colleagues and comparators of different colors and genders experienced different and more preferable treatment as compared to Plaintiff, and they did not suffer any adverse employment actions because of their race, color, sex, or prior protected activities. The above-mentioned actions by Defendants towards the Plaintiff demonstrate the discriminatory and prejudicial manner in which Defendants treated the Plaintiff and her lawful claims against it.

233.     The Defendants' aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American), color (Black), and sex (female).

234.     Pursuant to the Local Government Tort Claims Act ("LGTCA"), Md. Code (2020 Repl. Vol., 2021 Supp.), § 5-301 et seq. of the Courts and Judicial Proceedings Article ("C.J."), Plaintiff has provided sufficient notice to Defendants through her filing of internal and federal EEO charges regarding the claims stated in this Complaint.[5]

---

[5] "[S]trict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Renn v. Bd. of Comm'rs of Charles Cty*, 352 F. Supp. 2d 599, 603 (D. Md. 2005). Substantial compliance is satisfied "[w]here the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute." *Id.* In the context of employment discrimination, some courts have held that notice of an EEOC charge constitutes substantial compliance, at least if notice is provided to Defendants by the LGTCA deadline and the charge provides "the identity of the claimant, the time and place of the event, the nature of the claim, and the Plaintiff's intent to pursue litigation." *Nelson v. City of Crisfield*, L-10-1816, 2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Kimberly Glanville, respectfully prays that this Court grant her the following relief:

a. Enter a declaratory judgement finding that the foregoing actions of Defendants violated Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the MFEPA;

b. Grant a permanent injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct described herein and to prevent similar occurrences in the future, including but not limited to Defendants implementing appropriate policy changes, training, and monitoring to prevent future discrimination, retaliation, and hostile work environment, and to ensure compliance with federal and state anti-discrimination laws;

c. Award Plaintiff all economic and non-economic compensatory damages that would fully compensate Plaintiff for the termination of her employment in the amount of $5,000,000 (five million dollars and zero cents) including back pay, front pay, lost benefits, pension restoration, compensation for lost Overtime and completion of the DROP process through March 1, 2025, reimbursements for Plaintiff's out-of-pocket expenses, and compensation for psychological injury, humiliation, embarrassment, mental and emotional distress caused by the conduct of the Defendants alleged herein;

d. Order the restoration and adjustments of Plaintiff's pension to reflect the rank of Major and the years of services she would have attained, including all lost contributions, service credits, and amounts due from the Deferred Retirement Option Program (DROP) that were forfeited due to premature termination, including reimbursements for all pension amounts lost to ensure Plaintiff's retirement reflects the appropriate time and grade;

e.  Order written assurances from Defendants that Plaintiff will not be harassed, retaliated against, or subjected to further charges after separation from BPD, and enjoining Defendants, its officers, agents, and employees from making disparaging statements or communicating negative information to future employers or third parties regarding Plaintiff of her family;

f.  Reinstate Plaintiff's employment at the rank of Major with all attendant rights, privileges, and benefits including increased earnings at the current pay scale with the Baltimore Police Department or reputable public employer, and in the alternative compensation for lost promotional opportunities and the corresponding increase in pay, benefits, and pension;

g.  Order all specific remedies and additional relief as detailed herein, including record exoneration on all charges that have been reversed or found unsubstantiated, with retirement in good standing including issuance of retirement badge and ID card, restoration of all honors and privileges customarily afforded to retirees of BPD, and written assurances of non-harassment to protect Plaintiff against ongoing threats and harassment by named individuals including assurances of safety and compliance with BPD policy regarding workplace conduct;

h.  Award punitive damages for Defendants' willful and malicious conduct;

i.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

j.  Order such other relief as this Court deems just and equitable.


## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: September 12, 2025

Respectfully submitted,


By: /s/ Dionna Maria Lewis
Dionna Maria Lewis, Esq.
Bar No. 19486
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite 2098
Washington, D.C.20003
Tel. (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Kimberly Glanville*